IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| GLORIA A. PUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:12-cv-43-TFM |
| | ) | [wo] |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Gloria A. Pugh ("Plaintiff" or "Pugh") originally applied for supplemental security income ("SSI") and disability insurance benefits ("DIB") on February 19, 2009 alleging she became disabled on July 11, 2008. (Tr. 18, 132-139). After being denied, Pugh timely filed for and received a hearing before an administrative law judge ("ALJ") who rendered an unfavorable decision in November, 2010. (Tr. 15-35). Pugh subsequently petitioned for review to the Appeals Council who rejected review of Pugh's case on December 13, 2011. (Tr. 1-6). As a result, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner"). *Id.* Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c). After careful scrutiny of the record and briefs, for reasons herein explained, the Court AFFIRMS the Commissioner's decision.

## I. NATURE OF THE CASE

Pugh seeks judicial review of the Commissioner's decision denying her application for SSI and DIB. United States District Courts may conduct limited review of such decisions to determine whether they comply with applicable law and are supported by substantial evidence. 42 U.S.C. § 405. The Court may affirm, reverse and remand with instructions, or reverse and render a judgment. *Id*.

## II. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

 "The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d

842 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

### III.  STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[1]  *See* 42 U.S.C. § 423(a).  The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program.  SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.[2]  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986).  Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes. *See* Social Security Administration, Social Security Handbook, § 136.1, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

[2] SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general tax revenues.  *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

> in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

> (1) Is the person presently unemployed?
>
> (2) Is the person's impairment(s) severe?
>
> (3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]
>
> (4) Is the person unable to perform his or her former occupation?
>
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004). Claimants establish a prima facie case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238-39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id*. It also can contain both exertional and nonexertional limitations. *Id*. at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id*. at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or hear testimony from a vocational expert (VE). *Id*. at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Id.* at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id*.

### IV. ADMINISTRATIVE FINDINGS AND CONCLUSIONS

Plaintiff, Gloria Pugh, age 45 at the time of the ALJ's decision, completed the eleventh grade in special education classes. (Tr. 43). In the relevant past, Pugh performed work as a chicken cutter, a light unskilled position for nine years, and then as a cashier at

---

[4] *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

WalMart, a light semi-skilled position, for eleven years. (Tr. 43-46, 63, 164). The record demonstrates that Pugh completed a function report on April 2, 2009, (Tr. 172-180) wherein she states that she can pay her bills, handle a savings account, use a check book and money orders, and count change. (Tr. 176). She also reported that she left the house two to three times a week, went shopping twice a month for about four hours, had family over during the day, and her hobbies included playing cards, reading the Bible, going to church, and going to Bible study with friends twice a week. (Tr. 46, 52, 176-77, 259). In April 2008 and again in August 2010, a month before her administrative hearing, hospital records reported that Plaintiff did not need assistance with activities of daily living. (Tr. 231, 358).

    At the September 16, 2010 hearing, Pugh testified that she tried working for one week at a condom factory as a packager, but could not do the job because of her hands. (Tr. 44). Pain in her left knee also prevented her from working as a cashier at Wal-Mart. (Tr. 44-45). She said that her supervisor at Wal-Mart worked with her for about two months before she understood how to make change for a customer and that her daughter handles her finances. (Tr. 45-46). Pugh also testifed that she cannot use her hands to lift and that she can "barely walk a half a mile without stopping" because of pain in her knee. (Tr. 47). At the hearing Pugh wore splints on her wrists and told the ALJ that her hands prevent her from using a cane she needs for walking and that she can not lift a gallon of milk. (Tr. 54). Pugh also testified that she has sleep apnea and uses a C-pap machine to sleep at night. (Tr. 49).

The ALJ determined that Plaintiff's "bilateral tendinitis in the upper extremities; sleep apnea; borderline intellectual functioning; depressive disorder, not otherwise specified; osteoarthritis of the left knee; and obesity" were all severe impairments (Tr. 20). She specifically explained that she did not consider Plaintiff's CTS severe because it had not been confirmed through electromyogram. (Tr. 21). The ALJ ultimately assessed an RFC for light work with significant restriction. (Tr. 24). The ALJ included the following limitations: (1) for Plaintiff's wrist pain, Plaintiff was limited to occasionally using her upper extremities for pushing and pulling, and frequently reaching, handling, fingering, and feeling; and (2) for her mental impairments, the ALJ found Pugh was "able to perform simple routine tasking involving no more than simple, short instructions and simple work related decisions with few work place changes." (Tr. 24).

In making this determination, the ALJ thoroughly analyzed the medical records and hearing testimony; relied upon Vocational Expert testimony (*see* Tr. 62-68), assigned weight to certain medical source opinions; and found Pugh less that fully credible. In making the credibility finding the ALJ noted Pugh failed to seek treatment, received only conservative treatment, and participated in activities inconsistent with her allegations of pain. (Tr. 25-30). She specifically found Pugh was capable of performing the requirements of representative occupations such as an information clerk, garment folder and garment bagger. (Tr. 31).

## V.  MEDICAL HISTORY

On September 6, 2008, Dr. Ghostley performed a consultative examination. (Tr. 259-261). Pugh complained of tendinitis in her right hand and right knee pain. (Tr. 259).

She also reported, "becoming increasingly depressed due to her inability to work." (Tr. 259). Dr. Ghostley performed IQ testing. (Tr. 260). He diagnosed depressive disorder, learning disorder, and borderline intellectual functioning. (Tr. 26). He also opined that Pugh's "ability to understand, remember, and carry out instructions, as well as to respond appropriately to supervisors, co-workers, and work pressures in a work setting, is moderately impaired." (Tr. 261). However, Dr. Ghostley further opined that "Pugh's prognosis should improve with medical/psychiatric help." (Tr. 261).

On September 9, 2008, Dr. Banner performed a consultative examination. (Tr. 263-266). Pugh reported to Dr. Banner that "she drops objects frequently and has difficulty doing her and her daughters hair due to pain with repetitive movement. She complains of numbness at times in the right hand." (Tr. 263). Dr. Banner noted Pugh was unable to make a complete fist with her right hand, (Tr. 264) and that she "limps heavily on left leg without use of cane." (Tr. 265). Dr. Banner reported that fine and gross motions in the right hand were diminished. (Tr. 266). He diagnosed right wrist pain, left knee pain and obesity. (Tr. 266).

On October 9, 2008, Dr. Nolan performed a psychological exam. (Tr. 270). He noted that Pugh was "alert and oriented to time, person, place and circumstance"; that "[h]er thought process is rational, coherent, informed and proceeding at normal pace, in no acute distress and evidencing no sensory deficit"; that her "[m]otor, speech, and language skills were noted to be intact"; that she "generally understood instructions and seemed to maintain good interest and effort"; and that "[c]oncentration was noted to be variable, as she tended to make careless mistakes." (Tr. 271-72). Noting concern for the

inconsistencies "between her current cognitive level of function and her work history," Dr. Nolan ultimately assessed "overall mild deficit in intellectual functioning." (Tr. 272-73). In April, 2009, Dr. Hinton, a state agency psychologist, reviewed Pugh's records and opined that her mental health caused mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 294).

On March 10, 2009, Pugh was diagnosed with DeQuervain's tenosynovitis at Southern Bone and Joint. (Tr. 277). On August, 24, 2010, she was prescribed wrist splints at the emergency room for carpal tunnel syndrome and osteoarthritis. (Tr. 350; 357). On May 31, 2011, Pugh presented to the hospital and was diagnosed with bilateral pulmonary embolism, left-sided chest pain, morbid obesity, sleep apnea, and newly diagnosed diabetes. (Tr. 263) She was discharged from the hospital on June 7, 2011. (Tr. 382).

## VI. ISSUES

Pugh raises three issues for judicial review:

(1) Whether the ALJ erred by failing to properly evaluate Pugh's carpal tunnel syndrome?

(2) Whether the ALJ's Residual Functional Capacity Findings are based on substantial evidence?

(3) Whether the ALJ erred by asking an incomplete hypothetical to the Vocational Expert?

(*See* Doc. 12 at pp. 4-15).

## VII. DISCUSSION

### I. The ALJ properly evaluated Pugh's carpal tunnel syndrome

Plaintiff complains that the ALJ failed to properly evaluate Pugh's carpal tunnel syndrome ("CTS"). First, Plaintiff argues that the ALJ erred by failing to find her CTS severe at step two. At step two "an impairment . . . is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3 p, 1996 WL 374181 at *1. A claimant bears the burden at step two of showing that he has a medically severe impairment or combination of impairments. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987).

The only medical evidence in this case which would support a diagnosis of CTS is from Plaintiff's visit to the emergency room at Southeast Alabama Medical Center in August 2010. (Tr. 344-57). The clinical impression included CTS. Indeed, the examining doctor, Dr. Hughes, administered two physical tests: the Phalen's test and the Tinel's Sign; both were positive. ( Tr. 357). CTS may be diagnosed through electrodiagnostic testing, including electromyogram testing, or physical tests, including Phalen's Test and Tinel's Sign. *See,* University of Maryland Medical Center (2011) http://www.umm.edu/patiented/articles/how_carpal_tunnel_syndrome_diagnosed_000034_7.htm. However, other medical evidence contradicts this diagnosis. Dr. Banner, a consultative physician, who examined Pugh in September 2008 noted that Pugh was negative for Tinel's (Tr. 264-66) and in March 2009, Dr. Lolley noted that Pugh was negative for Tinel's, but did diagnose De Quervain's tenosynovitis in Plaintiff's right wrist. (Tr. 277).

Even if Pugh is correct that the ALJ erred in failing to find CTS to be a "severe" impairment at Step 2, this is not reversible error, so long as the ALJ considered both severe and non-severe impairments, including CTS, in the subsequent steps of the sequential process. *See Newsome ex rel. Bell v Barnhart,* 444 F. Supp. 2d 1195, 1201 (M.D. Ala. 2006).  (Failure of ALJ to make determination as to severity of impairment was harmless error where ALJ thoroughly discussed the evidence of the impairment.)  Moreover, under agency regulations the ALJ considers all of Plaintiff's impairments, both "severe" and "nonsevere", in the sequential evaluation process.  *See* 20 C.F.R.§ 416.923 ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.")

In this case, the ALJ considered Pugh's CTS and wrist pain generally at later steps in the sequential process. (Tr. 25-26).  The ALJ found Pugh's allegations of CTS and tendinitis to be "less than fully credible," observing that while Pugh alleged her wrist pain persisted since 1990, she failed to seek treatment for it until September 2008, despite seeking care for other maladies. (Tr. 25-26; 202-57; 280).  Further, the ALJ noted that after starting care, Pugh allowed more than a year to pass between treatments. (Tr. 26, 61, 277).  Moreover, the ALJ recognized that in contrast to the CTS diagnosis, a wrist x-ray was "normal" and that both Dr. Banner and Dr. Lolley reported that Plaintiff was negative on a Tinel's test. (Tr. 27, 264-66, 268, 277).  Given the ALJ's thorough review

of the record evidence concerning Pugh's wrist pain, the ALJs exclusion of her CTS as a severe impairment at step two is harmless error in the course of his ultimate determination that Pugh is not disabled. *Id*. at 1201.

Pugh next argues that the ALJ erred by substituting her opinion for that of a medical provider when he rejected Pugh's CTS diagnosis because it had not been confirmed by an electromyogram. *See Marbury v. Sullivan,* 957 F. 2d 837, 840-41 (11th Cir. 1992). ("An ALJ may not arbitrarily substitute her own hunch or intuition for the diagnosis of a medical professional.") However, this argument, at its core, is essentially a restatement of Pugh's earlier argument that the ALJ erred in not finding her CTS severe because an electromyogram had not confirmed the diagnosis. However, as more thoroughly discussed above, because the ALJ reviewed the record evidence of Pugh's wrist pain and alleged CTS and tendinitis and considered it in the course of his ultimate determination that Pugh is not disabled, this argument fails.

Pugh next argues that the ALJ erred in failing to order a consultative exam to complete an electromyogram. The law is clear; a Commissioner's duty to develop the records includes ordering a consultative examination if one is needed to make an informed decision. *Reeves v. Heckler,* 734 F. 2d 519, 522 n.1 (11th Cir. 1984)(finding error where an ALJ failed to order a consultative exam when an agency doctor had recommended it). However, in *Browning v. Astrue*, the district court held that the ALJ was under no obligation to order an additional consultative examination because the ALJ's decision discussed "a wide range of medical evidence" including both treating and consultative examinations and because neither Plaintiff's counsel nor any physician of

record had recommended or requested an additional consultative examination. 2012 WL 1424909, *7 (N.D. Ala. April 23, 2012).

Here no physician of record recommended an additional consultative exam regarding Plaintiff's alleged CTS. (Tr. 202-360). While the ALJ expressed a willingness to order additional examinations if necessary (Tr. 67), there is no evidence that Plaintiff or her counsel pursued a request for additional examinations or attempted to obtain additional records supportive of Plaintiff's CTS. Moreover, in this case prior to the hearing, the agency developed a record that spanned from 2002 through 2010. (Tr. 208 - 344). In addition to substantial records from Plaintiff's treating physicians (Tr. 202-257; 274-82;312-60), the Agency ordered three consultative examinations (Tr. 258-73), x-rays of Plaintiff's knee and wrist (Tr. 267-68), and several non-examining evaluations of the medical evidence. (Tr. 283-311). Based upon the court's independent review of the record, the court concludes that the ALJ thoroughly analyzed all of the relevant records, articulated the weight provided to certain health care providers, and gave sufficient reasons for discounting Pugh's credibility. (Tr. 20-30). Accordingly, the court concludes that the ALJ properly evaluated Plaintiff's CTS.

**II. The ALJ had substantial evidence to make her residual functional capacity determination and posed a proper hypothetical to the VE.**

Next, Plaintiff argues that the ALJ erred in assessing her residual functional capacity ("RFC") because she did not include limitations Plaintiff alleges are necessary in either her hypothetical questions to the VE or her ultimate RFC. The court notes that the exertional level and limitations in the ALJ's hypothetical question to the VE (Tr. 63-64)

are identical to those in her RFC. (Tr. 24). However, Plaintiff argues that the RFC should have contained additional limitations regarding (1) her wrist pain and (2) her "moderate difficulties" in social functioning. (Doc 12; Pls. Br. 12-14).

An RFC assessment is used to determine the claimants' capacity to do as much as they are possibly able to do despite their limitations. *See* 20 C.F.R. § 404.1545(a)(1) (2010). An RFC assessment will be made based on all relevant evidence in the case record. *Id.*; *Lewis v. Callahan*, 125 F.3d at 1440. At an ALJ hearing, "the [ALJ] is responsible for assessing [the claimant's] residual functional capacity." 20 C.F.R. § 404.1546(c) (2010). The claimant is "responsible for providing the evidence [the ALJ] will use to make a finding about [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(a)(3) (2010). The ALJ is "responsible for developing [the claimant's] complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [their] own medical sources. *Id.; Holladay v. Bowen,* 848 F.2d 1206, 1209-10 (11th Cir. 1988). (The ALJ is not required to order a consultative examination unless the record establishes it is necessary to render a fair decision). The ALJ's finding must be supported by substantial evidence. "Substantial evidence is less than a preponderance, but rather such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Moore v. Barnhart,* 405 F.3d 1208, 1211 (11th Cir. 2005) (citations omitted).

Here, Plaintiff argues the ALJ's finding that she could "frequently reach, handle, finger, and feel" is inconsistent with both the hospital's direction to wear wrist splints and

to ice and rest the wrist when swelling or pain occurs, and Dr. Banner's findings of diminished strength and motor skills in Plaintiff's right hand. (Pl. Br. 14). However, none of the physicians of record placed any restrictions on Plaintiff's use of her hands for reaching, handling, fingering, and feeling. (Tr. 262-68, 274-82; 344-57). In fact, both Dr. Simmons and Dr. Foster found no manipulative restrictions were necessary. (Tr. 298-305; 310-11). While Dr. Banner observed in his examination diminished strength and motor skills in Plaintiff's right wrist, he assessed no limitations arising from this finding. Indeed, the x-ray he ordered showed no abnormalities in Plaintiff's wrist. (Tr. 263-68).

The Emergency Room records note Plaintiff's wrist was placed in a wrist splint, but nothing in the record suggested Plaintiff must wear these wrist splints permanently or that the splints would prevent Pugh from "frequently" reaching, handling, fingering and feeling. (Tr. 344-57). Similarly, the instruction to ice and rest Plaintiff's wrist were part of a discharge sheet and were not specific instructions for Pugh to continue such treatment on a permanent basis. (Tr. 347). Thus, the court concludes that the limitations assessed by the ALJ for Pugh's wrist pain are supported by substantial evidence.

Next Pugh argues that the ALJ's RFC does not account for the "moderate difficulties" in "social functioning" that the ALJ found earlier in her decision. (Tr. 22, 24). The ALJ found Pugh "is able to perform simple routine tasks involving no more than simple, short instructions and simple work related decisions and few work place changes." (Tr. 24). Pugh points to *Winschel v. Comm. of Social Sec.,* 631 F. 3d1176 (11th Cir. 2011) for the proposition that "an ALJ must incorporate the results of the PRT into his findings and conclusions." *Id.* at 1181 n. 1.

At step two, the ALJ assessed Pugh's limitations and restrictions from her mental impairment as part of a Psychiatric Review Technique ("PRT") Form, which is not an RFC assessment. *See* SSR 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria [of the PRT from] are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRT" form). In other words, an ALJ is not required to include severity ratings (such as "moderate limitations") in the ultimate RFC; rather, the ALJ is required to translate these ratings into concrete restrictions on work activities, as appropriate.

Pugh again points to *Winschel v. Comm. of Soc. Sec.,* 631 F.3d1176, 1181 (11th Cir. 2011) for her argument that the ALJ did not indicate that Pugh's ability to work would not be limited by a moderate limitation in social functioning (Tr. 24) and further failed to account for this limitation when questioning the VE. (Tr. 64-67). (Doc. 12; Pls Brief at p. 14). Indeed, the *Winschel* Court held that the ALJ must pose a hypothetical to the VE which "include[s] or otherwise implicitly account[s] for all of . . .[Plaintiff's] impairments in order for the VE's testimony to constitute "substantial evidence." *Id.* The ALJ, in the instant case, specifically included in the hypothetical to the VE that the individual "[i]s able to perform simple routine tasks involving no more than simple short

instructions with simple work-related decisions with few work place changes." (Tr. 64).

An independent review of the record demonstrates that the ALJ found Pugh suffered "moderate difficulties" in social functioning at step 2, but that the ALJ adequately explained how the medical evidence established Pugh could still perform limited mental tasks. Indeed, the ALJ in step 2 discussed medical evidence which demonstrated a "mild" degree of limitation. First, Dr. Ghostley observed that Plaintiff was attentive, made good eye contact, had no abnormal mannerisms, had normal productivity and flow of speech, spoke in expressive tones and was fully coherent and understandable, and had no receptive language deficits. (Tr. 22; 259-60). Second, Dr. Nolan observed that Pugh was alert and oriented to time, person, place, and circumstance, that her thought process was rational, coherent, informed and proceeded at a normal pace; that her capacity to relate to others appeared to be intact, noting that she reported getting along with supervisors, grocery shopping and attending church. (Tr. 22; 270-72). Finally, Dr. Hinton determined Pugh was only mildly limited in social functioning. (Tr. 22; 294). Nevertheless, the ALJ concluded that "[d]espite claimant's numerous admissions of appropriate social functioning activities and the findings [of] Dr. Ghostley, Dr. Nolan, and Dr. Hinton, the undersigned will *give the claimant the benefit of the doubt* that she is moderately limited in this area." (Tr. 22).

Later in the sequential process when assessing Plaintiff's RFC, the ALJ described medical evidence which established Pugh's ability to do mental tasks, even though the ALJ had concluded previously Pugh had moderate social limitations. Indeed, the ALJ referred to both Dr. Ghostley and Dr. Nolan's observations that despite Pugh's mental

impairment, she had successfully worked at WalMart as a cashier, helping customers with purchases and customer service, for eleven years, which evidences a higher intelligence and adaptive functioning. (Tr. 28-29; 157; 260; 273). Furthermore, the ALJ provided great weight to Dr. Hinton, who explicitly assessed Plaintiff's difficulty with social functioning as "mild", noting Plaintiff could perform light, unskilled work. (Tr. 28).

The ALJ explicitly concluded that "[t]o the extent that claimant's mental impairment may have some limited effect on her current ability to function in the work place, the residual functional capacity finding includes sufficient accommodation. Specifically, she is limited to performing simple routine tasks involving no more than simple, short instructions and simple work related decisions with few work place changes." (Tr. 28). Thus, the Court concludes that the ALJ adequately explained, relying on the medical record, how Pugh could still perform light unskilled work despite a step 2 finding of moderate difficulty in social functioning. Moreover, the Court concludes that the ALJ tailored specific limitations in Pugh's RFC to the level of Pugh's impairments actually established in the record and adequately presented those impairments in the hypothetical to the VE. Accordingly, Pugh's contrary argument fails.

## VII. Conclusion

Pursuant to the findings and conclusions detailed in this Memorandum Opinion, the Court concludes that the ALJ's non-disability determination is supported by substantial evidence and proper application of the law. It is, therefore, **ORDERED** that the decision of the Commissioner is **AFFIRMED.** A separate judgment is entered herewith.

DONE this 3rd day of December, 2012.

                                            /s/ Terry F. Moorer
                                            TERRY F. MOORER
                                            UNITED STATES MAGISTRATE JUDGE